Argument not to exceed 15 minutes per side. Mr. Kreese, you may proceed to the appeal. I'm trying to hear. My name is Richard Kreese, and along with my co-counsel Robert Dunn, we've been working on this case for big dollars for a long time now. And pleased to be before the court for this opportunity. I'd like to start out, and I'm going to probably talk a little faster than I should. There's a lot of material here. But just to kind of set the groundwork, the prosecutor's theory of the case was that Ms. Fisher, the alleged victim, was bludgeoned at her place on Hull Road, taken to Hicks Road, temporarily dumped there. Then Mr. Altman had a change of mind because she was gurgling or something. And he retrieved her, and then he took her to the hospital. Mr. Altman gave an 18-page audio statement to a lieutenant Hall, and it states his position of the case. He said that they were traveling from her home, Hull Road, to McDonald's restaurant in town, maybe 10 miles. And in that process, they were going down Hicks Road. And she looked at him, opened the door a little bit, and he was braking, somewhat concerned. She unbuckled, and he reached over to help her, and then it happened again. He said he doesn't know why, they were having a good day, and she just stepped out of the car, rolled out of the car. Counsel, did he say that she unbuckled her seatbelt three times? No, that's what the victim's mother in court said. But in this statement you're talking about, he just said she unbuckled her... She unbuckled it, opened the door about one inch. He looked over and said, what are you doing? Tried to reach and help her. He wasn't sure if he helped her or not. It was a Cougar. It's a relatively narrow car. And then she looked at him and said, Jimmy, I love you, and she stepped out. You know, it's hard to believe that someone driving the car down the road could reach over and buckle the seat back. Well, I had a Cougar, that's all I know. He said he doesn't know whether he assisted her or not, but he was braking. And by the way, that whole process there, that 101 foot skid that they talk about, that took 1.96 seconds. From the start of that until that car came to rest. I point that out, I think it's important because things happen like that. Buckling, unbuckling... With the skid and the time it took to stop, wouldn't you say that shows the car was moving pretty fast? 1.9 seconds? Yeah. No, actually, I appreciate the question. The only person that testified with any credibility was Curtis Cater. Any credibility being your take on credibility or our standard of review with respect to credibility? Well, you have to look at what Trooper Robbins said. He was a prosecution's reconstruction expert. Trooper Robbins did not do an independent investigation. Trooper Robbins, if you read our brief, he lied five times to the court. Five times to the court. Well, you know what? You can get to that, but let me tell you why I asked the question I asked. And you can answer that question and then make these other points. What seems difficult about your case is you have two different ways of thinking about it. If the car's not going very fast, that would explain why there weren't a lot of scrapes. But it would make inexplicable the severe brain injury. If the car's going faster, that explains the brain injury, but then it creates the problem with the lack of other injuries. So that's – I was thinking when you said the skid, the length of the skid and the time, that would suggest the theory of 40, 45 miles an hour. But I don't really care. I think you've got to deal with the problem whether you think the car was going slowly or the car was going quickly. You have to deal with that problem, I think. I'm trying to do that. Curtis Cator said that the car was going 24 miles an hour at the beginning of that 101-foot skid. Somewhere in the middle of that 100 feet, she exited the vehicle. He said that his exit speed that he calculated would have been 13 miles an hour. Dr. Varani, the medical examiner in this place, said that if it was between 10 and 15 miles an hour, that he wouldn't expect these other injuries. He would expect, he put it, scratches. And what we're saying to the court, and we said it in our brief, these scratches, you could also say bruises. What happened at the hearing, the doctor and Mr. Walsh had testified, I'm sorry, I'm confusing you. At the hearing, Dr. Varani testified, 6500 hearing, I'm sorry, at trial. He said that she had three abrasions and one bruise. Three abrasions, one bruise. Everybody agreed, no contest. All those three abrasions, all three of them, predated the accident. And he also testified to one bruise. Her skull fracture is here, right there. And testified to one bruise there. Mr. Duke, among many other things, missed reviewing the records. Between the autopsy report, between Dr. Varani's preliminary examination testimony, and thirdly, because of his prelim testimony, we uncovered there were 11 secondary injuries there. And eight or nine of those were bruises. Mr. Duke didn't find those. They were plainly visible. Those bruises at the 6500 hearing, we brought them to Varani's attention. Dr. Varani said, if that happened at 10 or 15 miles an hour, then he said that that would indicate that those scratches, in fact, could be on her body. So we have the scratches that weren't uncovered by Duke. Varani did one other thing at that trial, at the 6500 motion hearing. Varani said that, because we asked him about this 10 to 15 mile an hour, changed his testimony, and he said, you cannot cause a skull fracture at that low a speed, 10 to 15 miles an hour. Counsel, let me ask you this. Okay, I'm sorry. Go ahead and finish what you're saying. The jury has decided this case. It's a hard-fought case. It's got several theories. Why should we set aside what the jury has done? Why aren't we satisfied with what the jury has done? Why should this court in habeas set aside what this jury, after a full trial, has done? Because Mr. Duke did not defend his client at all, and because the prosecutor, an example like with the five lies told by their accident reconstruction expert, he didn't get a defense. Can you be more specific about what Mr. Duke failed to do or did wrong? Okay, I'll go back to what I was saying. For example, he didn't investigate her secondary injuries. He just didn't do that. And those are consistent with a slow-speed accident. Beyond that, I'm sorry. How do we know that? I mean, the evidence from reading about the state's case, it seems that there's just a major evidentiary problem here, which is that the victim could not have sustained the injuries that she had in the sort of accident that your client had testified about. Now, you know, that's a situation Mr. Duke has got to deal with. What is he supposed to have done specifically? What could he have done as a result of any investigation that would have made a difference here? He could have investigated. But what would he have found out? And who would have testified to it? I'm sorry. Who would have testified to it? What could he have found out had he investigated? And who would have testified to what he found out? Dr. Browning would have testified if he, in fact, asked him the questions. The only thing the prosecutor brought on that trial, period, was these three old abrasions and that one bruise. And Mr. Duke did not do any discovery, not discovery, but he didn't do any investigation. He didn't find out about those other bruises that we did. How did you find them out? We read the background material. They were clearly in the autopsy report, some of them, clearly in his preliminary examination testimony, and most importantly probably a pretrial hearing testimony, which Mr. Duke was present at. So that's not a failure to investigate. That's a failure to use the information he already had. He didn't have that information. He said he never found that information. And where did he say that? If he was there at the preliminary examination it was testified to, you would think he heard it. He was sick in winter. You would think he heard it if he was there at the preliminary hearing. Precisely. I think the big question is why didn't he question Dr. Browning on this? He didn't bring it up. He allowed the prosecutor to say there was only one bruise, and Prosecutor Welch throughout, throughout, kept saying she had a single isolated injury. And the way it looks, there's complicity between the prosecutor and Browning. As a matter of fact, Browning, let me add this. I wanted to say it before. Let me just get to this question. Tell me your version of what the evidence would have shown with good counsel. Would it have been the theory that the car was going slowly? Oh, yes. Okay, that's your theory. The car was going slowly. That explains why there weren't a lot of other abrasions. And then what's the medical testimony that says with the car going 10 to 15 miles an hour, you get this kind of brain injury from going out of the car? Where is that? Dr. Browning said that even at 10 to 15 miles an hour, that injury is not going to help. That skull fracture. Is not going to or is? No, no, that's not enough to cause the skull fracture. Okay. 10 to 15 miles an hour. Okay, that hurts you. Yeah, until at the 6500 hearing. We asked him specifically if he was familiar with the case of Harris versus GMC, the Workman Comp case. Time out. I don't understand how case law is going to help me looking for the medical testimony that would have supported the theory you're presenting us today. Because you have to show they behaved irresponsibly, negligently, but that it was prejudicial. And to make it prejudicial, you've got to get medical testimony that shows that a car going 10 to 15 miles an hour, someone goes out of it. I mean, first of all, at that speed, why they're going to land on their head is beyond me, but I'll give you that. But at that speed, you're going to get this injury. Dr. Browning said that when we pinned him down on that, the 10 to 15 miles an hour because of Cater's 13 mile an hour estimated exit speed. We asked him about that, and he said, I've been doing this 25 years. He says, and you cannot get a skull fracture from them. That's why the Harris case, we asked him about that. Harris died a standing fall. And Browning said, you can't fracture the skull from a standing fall. You can't even do it 10 to 15 miles an hour. He was the medical examiner on the Harris case. But his testimony, whether at trial or at the preliminary hearing, seems completely unhelpful to your client. I mean, why is it not more likely that Mr. Duke decided that he could best minimize Dr. Varani's testimony by shutting up? You think the testimony helps because of this one cross-examination question. That's your theory. No, there's all kinds of things. Let me ask. Well, Dr. Varani basically said, you cannot get this kind of skull fracture falling out of a car. You can't even get it if you fall backwards. The only thing it's consistent with is a blow of great force, and I believe the death was a homicide. That's the gist of his testimony. Now, what's Mr. Duke supposed to do about that that would make a difference here? The whole scheme of what happened on Hicks Road was not investigated by Mr. Duke, and it goes to Dr. Varani and a lot of other things. But, I mean, we got the investigation point, but what you have to do is you have to show with good investigation they would have found this, and then here's the doctor that would have shown that this kind of fall was consistent with 10 to 15 miles an hour. But I don't see that. With good investigation, he would have found out the following, the spin marks that the prosecutor claimed took. You're going back to the investigation of the accident. No, because there's seven or eight different things here that Mr. Duke didn't do. I'm granting you all of that. I'm agreeing with you. I'm agreeing with you. Where's the evidentiary evidence that Mr. Duke didn't do this and this and this? I mean, what proceeding did it occur in? How about this? Wait a minute. I think your time is up, and I think we're past the how about it stage. I think you need to talk to us more in rebuttal, all right? All right. Can I continue or not? Well, not if you want. Didn't you say some rebuttal time? Just a minute, yeah. Well, if you want to take up your minute, you've got a minute, but that's it. Okay. I didn't understand that the question and answer were all part of that because I haven't. No, we don't subtract the time. She's giving you the full minute. If you sit down, she's giving you the full minute. Okay. Did you hear that? Yes, I did. Okay, yeah. Good morning. May it please the Court, Bruce Edwards, Michigan Assistant Attorney General on behalf of the Warden. This is a habeas case involving a Strickland claim, and that means it's subject to double deference. There's really been not much discussion about that, and that obviously makes it even harder for the petitioner to prevail. And most of the arguments I've heard today were as if you were like a Michigan Court of Appeals panel as opposed to a habeas panel reviewing a district court denial of habeas relief. Now, the briefing that was filed by- You know, what is the theory? I know this is not a sufficiency case, but what was the government's theory as to what really happened? She- Like when, where, and how? Well, you know, the prosecutor said, I don't have to show where it happened. It might not have happened on Hicks. So it could have happened earlier, but he didn't say it did happen earlier, and that was one of the things that the state trial court, you know, went out- By lying, you prove you committed a murder. There's a Michigan Court of Appeals case that says if, in fact, you create a false, exonerating story, that that can be considered- Establishes the elements of murder? That can establish circumstantial evidence that you may have committed the crime. And we had here testimony from- I'm just- I don't know much about this. I know it's not being challenged, but it might be the only thing that's interesting to me about this case. Is there a Supreme Court precedent that says that's okay? I mean, you can- Published Michigan Court of Appeals. You can have a negative case of establishing the elements because- So what if the person never testifies? Right. Well, what happened is we had a statement that the petitioner had given to Lieutenant Hall, and in that statement, he admitted, I was with her all day, and I was with her when she was injured. And then he came up with a false explanation as to how she was injured. And the trial judge denied a motion for a directed verdict, saying, well, if you were with her all the time, and she was injured when she was in your presence, and you've created this false explanation as to how the injury occurred, a jury might reasonably conclude that you injured her in a different way. Well, the linchpin, I mean, certainly his statement and certainly his credibility was at issue. But the real strength of the prosecutor's case, as I understand it, came from the scientific evidence that this injury could not have happened in this way. And even more than- Is that right? It is correct. And there were several nurses and several doctors that all said there were no abrasions to her hands, to exposed elbows, to her face. There was no dirt in the wound in the back of her head. Her clothing wasn't torn. Her presentation was totally inconsistent with somebody that went out of a car while it was moving. And so, therefore, his explanation, you know, is undercut in its entirety. I know, but what's funny about that whole way of proving murder is there's lots of reasons you lie. There are. The one we're jumping to is the assumption you committed the murder, but it might have been your brother or a friend that you're lying. You're protecting someone else. It doesn't prove you committed murder. That's theoretically possible, but the jury found the evidence sufficient, and this court denied a COA on the sufficiency of the evidence question. Do we even know other than through Mr. Altman's statement that they were ever on Hicks Road? Yes, because they found the blood pool on that. They found the blood pool. She was definitely there. And her feet had been dragged. One of her shoes was dragged through a blood pool. They took photographs of the road. Was there blood in the car? Yes, there was. Because he drove her to the hospital, so that would be expected. Trauma occurred how? A blunt force hit. But you don't know exactly how. That's correct. A fist? Could not have been a hand. Dr. Varani was quite certain it could not have been a hand. So I think somebody said maybe a two-by-four. We just don't know. She was hit with something, a blunt force, the back of her head. We don't know whether that occurred on Hicks Road or at an earlier time. That's correct. We don't know. I guess there was no search of any other likely premises. Well, they did search his house, and they didn't find anything. So they did look other places. Did she live there or someplace else? She had been there with him. And I think they searched her place as well. Okay. And they did not find any blood there. Now, in evaluating whether or not counsel was ineffective, my first point would be that the jury acquitted the defendant of first-degree murder. So counsel ought to get some credit for that. I mean, he has an early release date in six years from now instead of life without parole because of Mr. Duke's representation. Several of the arguments I heard today are outside their certificate of appealability. Their certificate of appealability is only as to Mr. Duke's behavior, not whether or not a trooper lied five times. You know, that's all been refused. In the briefing, they argue that chronic applies and not Strickland. Well, the district court, the trial court all said, no, this is a Strickland case. And I went back and checked, and they didn't even exhaust a chronic argument in state court. So that argument doesn't work. Then they argue in their brief that Harrington v. Rischer doesn't apply because the Michigan Court of Appeals and Michigan Supreme Court deference under Harrington v. Rischer because the Michigan Court of Appeals and Michigan Supreme Court just issued one-sentence orders. But as this court knows, you go back to the last reasoned opinion, and here it's the trial court's opinion after the motion for relief from judgment evidentiary hearing. And that's a 24-page opinion. The trial judge very carefully went through everything. And, in fact, at one point he even said most of the arguments counsel were presenting were based on a misunderstanding of the state's case. And then the district judge, who was a visiting judge, she actually said this court must agree with Judge Lauterbach's observation that most of Altman's arguments demonstrate a fundamental misunderstanding of the state's case against him. Many of his arguments also overlook the limitations imposed by statute and Supreme Court precedent in this court's review on federal habeas claims. That's page ID 4160. So a substantial defense was not unpresented. The jury heard evidence that this woman had been taking drugs, that she was mentally unstable. But the statement to Lieutenant Hall, the petitioner said she was doing good that day. She was doing fine that particular day. Taking on the procedurally defaulted arguments, you don't much care whether we look at it that way or jump to the merits, assuming you win on the merits. If you lose on the merits, you want us to address the procedural default, I take it. That would be correct, Your Honor. But we have jurisdiction to take either approach. And sometimes these ineffective cases, they sort of are dependent. You know, to find it wasn't an effective assistance, you have to find ineffective assistance didn't occur. So it gets sort of complicated in that way. And then as to the condition of the road, dozens of photographs, and, in fact, a video of the road the day after the accident were seen by the jury. The jury knew what kind of condition the road was in, how gravelly it was. They tried to make a big deal about it was not as gravelly as people thought. But when you have photos and a video shown to the jury, they knew exactly the condition of the road. Mr. Duke did present a defense. And he got the defendant acquitted of first-degree murder. The trial judge bent over backward and allowed a discretionary evidentiary hearing and a 24-page reasonable opinion. And the district court, in finally denying relief, said this court has rejected each of petitioner's claims of ineffective assistance of counsel and firmly rejects. That's what she said. She firmly rejects his condition that post-conviction trial court's order offends reason. So this was a reasonable decision by the state court. The district court properly reviewed it. Her opinion is 105 pages. I've never seen an opinion so long. She thoroughly considered this case and resolved it in a manner consistent with Ed Poddeference. So the longer our opinions are, the better they are? Is that the point you're making? Well, she thoroughly knew the file, I guess is my point. At least it shows we've taken the case serious. Exactly, exactly. 105 pages, we don't normally get that in a case like this. I've reviewed a lot of habeas opinions. This is the longest one I can remember, I can tell you that. How old is this fellow? At the time he was 4 years old, she was 37. And he's been in prison how long? 11 years as of December. And eligible for parole in about five years? In six years. Six years. Yes, sir. Thank you. So I would ask this court to affirm the district court's opinion because a reasonable court could decide the case the way it was decided. The trial court was a fair-minded jurist, and there was no extreme malfunction in this case. Are there any questions? Thank you. All right, I think you have your one minute. Thank you. This is one that I was going to start talking about before the questions, which I did appreciate. There's a strong argument here for his actual innocence, and let me pose that to the court. Number one, and this is irrefutable, profuse and sudden blood loss at Hicks Road, Dr. Brownie testified, and I'm using his words here, he said that open wound would bleed profusely as soon as the wound is open. He said it would begin within a second or two, and then he said it would maybe take more than a few seconds for that amount of blood to accumulate. That amount of blood in one of the puddles was two foot by three foot. Hicks Road. This counters the prosecution's repeated statement that she died from a cowardly isolated blow from behind. Now, this is the prosecutor's line. Dr. Brownie said the pattern of injury to that skull fracture was consistent with the head in motion. And he said specifically, he said if, in motion, he said if, and he said it was not that she was approached in a cowardly fashion from behind. Mr. Walsh, the prosecutor, lied to the jury. He told them it could happen either way. And that's, why did he do that? Because it got away from the evidence that this happened on Hicks Road, and that's what he was trying to do. So her head was in motion. You have the profuse bleeding there. He said, not only that, he said if it happened somewhere else. Your time is up. Can I finish my sentence? Yes. If it happened somewhere else, it would be noticeable. If no blood was found at that location. I think we're into his second sentence now. I apologize. Thank you. We appreciate the argument both of you have given, and we'll consider the case carefully.